# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## Merrick's Estate.

On sales made by a factor, the principal may recover the price due by the vendee, subject to the equities which the vendee has acquired by dealing with the agent as principal, or which the agent may have acquired from the course of dealing between him and the vendee.

But this rule does not apply to a sale made by a factor here, for a principal in a foreign country, where exclusive credit is given to and by such factor; nor can a suit be sustained by the principal, except through and by the factor; and on the bankruptcy of both principal and factor, the assignee of the latter is entitled to the price of the goods sold.

It seems, that where such factor is insolvent, a court of equity might compel payment of the debt to the principal, in a proper case.

But such case does not exist where the principal has sued the factor for the value of the goods, and obtained an award of arbitrators for his claim, and prosecuted him to bankruptcy for the debt, and became himself assignee of the bankrupt, and no account appears of the assets received.

An award of arbitrators chosen by the parties is conclusive of the controversy, and has the effect of changing the right to the money or property claimed, in the same manner as a judgment.

The validity of the petitioning creditor's debt, on which a commission of bankruptcy issued in England, cannot be disputed here by the bankrupt, on the ground that the petitioning creditor was an alien enemy, in a case where the debt was settled by an award of arbitrators without taking that objection, and the bankrupt afterwards failed in an action of trespass brought in England against

V. — 2

the commissioners, and the chancellor, on application of the bankrupt, refused to supersede the commission, and a great lapse of time afterwards occurred.

The rule in Pennsylvania is, that an involuntary transfer by proceeding in bankruptcy in a foreign state, of property here, will be regarded, except so far as it interferes with the claims of American creditors ; and foreign assignees may sue here in the name of the bankrupt.

But, *quære*, whether the exception embraces creditors of the bankrupt at the time of the suit, or only those at the time of the assignment?

If an assignee of a bankrupt become bankrupt, and make an assignment as such, neither his assignees nor his personal representatives are entitled to a debt outstanding due to the original bankrupt; but it must go to a new assignee of the original bankrupt.

If funds are due to an agent, and on his death they come into the hands of his administrators separate and distinct from the assets of his estate, and are claimed by an assignee in bankruptcy ; *quære*, whether the Orphans' Court has jurisdiction to compel their payment by the administrator, or the claimant must sue at common law?

THIS was an appeal from a decree of the Orphans' Court, in the matter of the estate of Samuel Merrick deceased, on the settlement of the administration account of Hannah Merrick and John Vaughan, administrators of Merrick.

The facts of the case will appear in the opinion of the court, and also in detail, in 2 *Ashmead* 485, together with the arguments of the counsel in the court below, on all the points arising in the case.

The case was argued here by

*Markland* and *Broom*, for Roberts ; and,
*Miles*, for Walker and others.

The opinion of the Court was delivered by

Rogers, J.—This is an appeal from the Orphans' Court; and the facts which we conceive to be established by the evidence, and which are material to the decision of the cause in this court, seem to be these : William Walker and George Coggill, merchants in England, consigned certain merchandise to their factor and agent, William Roberts, Jun., a subject of the king of Great Britain, at that time residing in the United States. The goods so consigned were put into the hands of the intestate, Samuel Merrick, a commission and general merchant of the city of Philadelphia. These goods were sold on account of Roberts to Lewis Allen for the sum of $3104.69. Samuel Merrick died; and, on the 30th March 1813, administration was granted to Hannah Merrick and John Vaughan. The administrators being cited to settle their accounts, it appeared by a reference to an auditor, that there was in their hands the sum of $3661.72, the proceeds of sales of the goods deposited with Merrick in his lifetime, as factor, and received by his administrators. This fund was not mixed up with the general assets of the estate, but distinguishable therefrom.

After the sale of the goods to Allen, but before the proceeds had been received by Merrick's administrators, Roberts returned to

[Merrick's Estate.]

England; and, in July 1812, he was held to bail in the sum of £800. On the 22d of October 1812, all matters in dispute between him and Walker & Coggill were submitted to arbitration. On the 5th of January 1813, an award was made in favour of Walker & Coggill, for £2195 10s. 9d., including the sum due from Allen. The award was made on the allegation that it had been received by Roberts; but against the admission of this sum as a charge against him, Roberts protested. On the 11th of January 1813 Roberts was arrested on the arbitration-bond, executed by him on the 23d of October 1812, to the said Walker & Coggill, jointly, at the suit of the said Walker & Coggill, for not performing the award, and surrendered to jail; and this is the alleged bankruptcy to support the commission. On the 29th of March 1813, the usual bond to the Lord Chancellor was given, purporting to be the joint and several bond of William Walker, of Wortley, and George Coggill, of New York, though executed only by William Walker, whereon a commission of bankruptcy issued on their petition, dated the 6th of May 1813, directed to John Hardy and others; whereon William Roberts, Jun., was declared a bankrupt, and William Walker chosen sole assignee. The debt to support the commission was the arbitration-bond of the 22d of October 1812, to Walker & Coggill, jointly, and the award of the 5th of January 1813. William Roberts, Jun., was indicted capitally, for refusing to surrender and submit to be examined by the commissioners; was tried in March 1815, convicted and sentenced; but on the 15th of July 1815, he was pardoned, on condition of two years' imprisonment which terminated on the 15th of July 1817, and he was released on the next day.

Roberts brought an action of trespass and false imprisonment against the commissioners of bankrupt, reported in 3 *Maule & Selw.* 533, (*Roberts* v. *Hardy, Walker et al.*), in which the sole question was, whether there was a good petitioning creditor's debt to found a commission of bankruptcy, against the plaintiff. Upon the evidence then submitted, there was judgment for the defendants.

It appears that Roberts always contested the legality of the commission of bankruptcy, and never submitted to it; and that upon the hearing before the Lord Chancellor, his trial for his life, and his suit against Hardy and others, the facts now acknowledged to be true, in relation to George Coggill's residence, carrying on trade, &c., were not proved, owing to the want of the necessary evidence.

The commission of bankruptcy has never been superseded, although an application has been made to the Lord Chancellor, by Mr Roberts, for that purpose.

George Coggill, one of the firm of Walker & Coggill, came to New York in March 1811, and, on the 24th March 1812, declared his intention of becoming a citizen of the United States. In May 1812, he returned to England, and, about the 11th July 1812,

embarked for America with his wife and children, intending to reside there permanently. On the 25th March 1818, Coggill became a naturalized citizen of the United States, and has continued to reside in this country since his arrival in September 1812. On the 18th June 1812, war was declared between England and the United States. At the time Coggill sailed for the United States, he was not aware of the existing war between the two countries; but on his arrival at New York, he engaged in trade, sold goods coming from England, and made various remittances of money to this country, to his correspondents, on account of sales in America. In 1813, either for himself or others, or both, he had an interest in the profits of two vessels and their cargoes, bearing the Portuguese flag, but actually owned by Robert Roberts, then residing in New York. These vessels made a voyage from New York to Ireland, in 1813, under the Portuguese flag, as if owned by subjects of the kingdom of Portugal.

It appears that this interest in these vessels and their cargoes was given to Coggill, who was perfectly aware of their real ownership, in consideration of his agency, and recommendation to the house of James Walker, of Wortley in Yorkshire, to whom the proceeds of such cargoes were remitted, for goods received in America by the said Robert Roberts.

In 1812, Coggill contemplated a trade in British licenses. In a letter to one of his correspondents in England, he says, "I am now established here (New York), and have my liberty as free as the air I breathe, and can transact any business that other people, citizens of this country, can. You may therefore write to me by every cartel for this country, and you may just say anything to me you please, as letters coming in a cartel, or by way of Lisbon, are never molested, but come as regular as in times of peace; you may therefore send me the licenses, in a parcel, per first cartel for any part of the United States, for my address here."

William Walker, who was the sole assignee under the commissions of bankruptcy against William Roberts, is dead, and it does not appear that any other assignees have been appointed in his stead.

On the 5th of February 1817, Walker & Coggill dissolved partnership, and George Coggill transferred all his claim to the outstanding debts and obligations due to the late firm, to William Walker, his former co-partner. After the transfer so made, William Walker became bankrupt, and his property was assigned under a commission of bankruptcy in England. William Walker is deceased, and letters of administration on his effects in Pennsylvania have been granted to Thomas F. Shewell. William Roberts is also deceased, and letters of administration have been taken out, in this State, on his estate.

From an attentive examination of the evidence, we have but little difficulty in arriving at the conclusion, that the funds in

[Merrick's Estate.]

dispute are the proceeds of merchandise belonging to Walker & Coggill, consigned by them to William Roberts, Jr., who was the agent of various English houses for the sale of goods in the United States. The property so consigned was sold by Roberts, through the intestate, Samuel Merrick, who was a commission merchant of the city of Philadelphia; and among the sales so made on account of Roberts, were the sales to Benjamin Paxson and Lewis Allen. After the death of Merrick, Mr Vaughan, his administrator, received the amount of the debt due from Paxson and Allen; and this fund has been kept separate and distinct from the general assets of the estate.

The first question to which our attention has been directed, is, who is entitled to the fund in the hands of the administrators? Does it belong to the representatives of Walker & Coggill, or to the representatives of William Roberts, Jr? Out of this point, several others will arise, which it will be necessary to decide. In the argument of this case, in the Orphans' Court and here, William Roberts rests his claim to the money on two grounds. 1. That the court had before adjudged the fund to belong to him; and 2dly, that, independent of this judicial decree, the facts and merits of the case establish him, and not his principals, to be the rightful owner of the funds. We agree with Mr Justice King, that there is nothing in the proceedings of 1824 which excludes Walker & Coggill from asserting a right to the money. The reasoning of the court, as reported in 2 *Ashmead* 509, is so conclusive, that we have nothing to add to this part of the case. We also concur with him, that, although it be alleged, yet no evidence has been shown, that payment in fact has been made by the factors to their principals, on account of the debt due from Allen. There is, however, another point in which we do not agree. The point arises out of the proceedings which resulted in the bankruptcy of Roberts.

It is admitted that William Roberts, a British subject residing in the United States, was the factor of Walker & Coggill, merchants of England. The latter consigned certain merchandise to the former, who employed the intestate, who sold the goods to Allen, which was paid to the administrators of Merrick, and is now in their hands, to be paid over to the person who may be legally entitled to receive it. Roberts returned to England in 1812, and, on his return, Walker & Coggill sued him, and held him to bail in £800. The case was referred to an arbitrator, who awarded the sum of £2105 10s. 9d. In this sum, the amount due from Allen was included, at the instance of Walker & Coggill, and contrary to the representations and remonstrances of Roberts, who insisted that he was not chargeable with the debt, because the debt had not been paid by Allen. Roberts was arrested on the arbitration-bond for non-compliance with the award; was detained in jail for two months or more; and this being an act of bankruptcy, Walker & Coggill sued out a commission of bank-

ruptcy against him. William Walker was chosen sole assignee. The property of Roberts, the amount of which is not known, went into the hands of the assignee; but there is no evidence whether anything was ever realized from his estate, or not. The commission of bankruptcy has never been superseded. Although an attempt has been made, it still remains in full force and virtue.

This is the case of a foreign factor, who sold the goods at his own risk, and, for aught that appears, without any knowledge on the part of the original debtor, or of the sub-agent, that the goods did not belong to the vendor, or that Walker & Coggill had any claim whatever to them. As a general rule, a principal is entitled to the same remedies against third persons, in respect to contracts, as if the contract was made with him personally; and this whether he is a factor acting under a *del credere* commission, or the principal, at the time of entering into the contract, is unknown or unsuspected, or the third person has dealt with the agent, supposing him to be the owner of the goods. But the principle does not apply, for on other facts disclosed there is no privity between the principal and the debtor, and therefore no suit could be sustained by them against Allen for the amount of the goods sold to him by Merrick. The case falls within the exception of foreign factors; where exclusive credit is given, to and by the agent, the principal cannot be treated as in any manner whatsoever a party to the contract, although he may have authorized it, or be entitled to the benefit of it. Thus, it is held that a foreign factor, buying or selling goods, is treated as between himself and the other party, as the sole contracting party, and the real principal cannot sue or be sued on the contract. This is said to be a general rule of commercial law, founded upon the known usage of trade; and it is strictly adhered to, for the convenience and safety of foreign commerce. *Story on Agency* 434, and the authorities there cited. The goods were sold to Allen on account of Roberts. The latter, therefore, is the owner of the debt. The contract is made with him, and, consequently, there is no privity whatever between him and the foreign principals. No suit could be sustained by the latter, except through the former; his right to the money, at the most, being an equity arising from the ownership of the goods. Now, although I am willing to concede that a court of equity would, in a proper case, where the factor was insolvent, recognise this equitable right, and compel payment of the debt to the principal; yet the question is, whether, on the facts here disclosed, they are entitled, as against the legal claimant, to the equitable interposition of the court.

By the proceedings which resulted in the bankruptcy of Roberts, we incline to believe Walker & Coggill elected to consider Roberts their debtor for the amount of the goods sold to Allen. Of this they ought not to complain, as it was contrary to the earnest entreaties and remonstrance of Roberts, who insisted, before the

arbitrators, that, not having received the debt, he was not properly chargeable on account of it. The grounds upon which the arbitrators refused to allow a credit for the amount 'of this debt, we are not informed. We can conjecture that it must have been because they thought he had received it, or possibly that he ought to have received it, or that there was such mismanagement as rendered the factor personally liable to his principals. We can conceive of no other reason for the award. The effect of the award, which is an award at the common law, is, that Roberts becomes personally and conclusively bound for the debt.

The award, so far as appears, is certain, final, mutual; and embraces all matters submitted to the arbitrator. There is no mistake in point of law or fact apparent on the face of the award, or by any other authentic instrument. No irregularity by the arbitrator, in his proceedings in the examination of the parties or their witnesses, or any want of notice to the parties of the meetings, is shown. Above all, there is no corruption or misbehaviour of the arbitrator. Nor was there any fraud of the party, or concealment. The principals have not only obtained the award, which, as an award at common law, is conclusive of the right, except corruption or misbehaviour of the arbitrator be shown, but they have obtained the fruits of it; for it was for refusal to comply with the award, that the factor was declared bankrupt; in consequence of which all his property passed into the hands of his assignee. It must be remarked, that we have no evidence of the amount of property which came to his hands. No dividend has been declared; nor do we know how much, if anything has been realized from the estate. Of this we expect some account, when the petitioning creditors, one of whom was assignee, are asking for the equitable interposition of the court. Under the circumstances disclosed, the award will have the same effect as a judgment; for an award regularly made by an arbitrator, to whom matters in difference are referred, is conclusive, in an action at law, between the parties to the reference, upon all matters within the submission. It is generally likened to the judgment of a Court of Judicature: as far as regards the effect of an award, upon suits for the same cause of action, they are similar. Thus, like the judgment of a court of concurrent jurisdiction, an award, as a plea in bar, or as evidence, is conclusive between the same parties, upon the same matters directly in question. *Phillips on Ev.* 381; *Watson on Arbitr.* 141, 146. In answer to this, it is said, that the award may be set aside; but the same is true of a judgment by default. It may be admitted, as has been contended, that neither personal or real property is transferred by the mere force of an award. But in *Gascoigne* v. *Edwards et al.*, on the authority of *Crofts* v. *Harris*, (*Carthew* 187), it is ruled that an arbitrament, without performance, is a good plea, when the parties have mutual remedies. So a right to any species of property may be

ascertained, so as to give the party in whose favour the award is made, a possessory remedy for the recovery of it; for if two persons submit to arbitration a dispute respecting the *right* to certain land, or other property, when the arbitrator ascertains in whom the property belongs, the parties are concluded by the award. Thus in *Doe on the demise of Morris and others* v. *Rosser*, (3 *East* 15), it was held, that where the lessor of the plaintiff and the defendant in the ejectment had before referred their right to the land to an arbitrator, who had awarded in favour of the lessor, the award concludes the defendant from disputing the lessor's title, in an action of ejectment. The court say, the award cannot have the operation of conveying the land; but there is no reason why the defendant may not conclude himself, by his own agreement, from disputing the title of the lessor in ejectment. The parties consented that the award of the arbitrator chosen by themselves should be conclusive as to the right to the land in controversy between them. And this is sufficient to bind them in the action of ejectment. Upon a similar principle, it has been held, that if one party agrees in writing with another, that he shall own and hold a piece of land to him and his heirs, and he delivers him the possession, and that possession is held and enjoyed for a time beyond the memory of man; in such case, though the writing be deficient in the requisite terms to pass a fee, the party will be concluded by his agreement and subsequent acts, from disputing the title. *Emans* v. *Turnbull*, (2 *Johns*. 313, 322). The cases go on the ground of an estoppel, which is as well applicable to an award as to a judgment, between the same parties. If, therefore, a judgment would conclude the right, by parity of reasoning an award would do so likewise. If the principals would have concluded themselves from asserting their equitable right to the money in controversy, by obtaining a judgment against the factor, for the same reason they have concluded themselves by the award in question.

Nay more; the case may be presented in a stronger point of view; for the facts assimilate it rather to a judgment executed, than to judgment simply, without more. For the effect of the award, and the proceedings on it, has been, that all the property of the factor passed, and is now, for aught that appears, in the hands of the representatives of the assignee; which representatives or assignees are claiming the right to be permitted to go against this fund. A commission of bankruptcy is considered by the court as a species of execution; and for this reason, the chancellor exercises the same discretionary power over it, to prevent the abuse of it as a process, as the other courts are in the habit of exercising over their respective writs and executions. *Eden on Bankruptcy* 431; 1 *Rose* 283. Now as to the effect of a judgment, it is very true, as is said by Chancellor Kent, (2 *Kent's Com*. 388), that there are many conflicting decisions in the books, whether a

recovery by judgment, in trespass or trover, of the value of chattels, does by implication of law, *per se,* amount to a transfer of the title to the defendant, or those who hold under him, without payment or satisfaction of the judgment. But *although this be so,* yet since the case of *Floyd* v. *Browne,* (1 *Rawle* 121), and *Marsh* v. *Pier,* (4 *Rawle* 273), it is not an open question in this State. A judgment for the value of the chattel is placed on the same footing as an' *actual satisfaction,* and consequently devests the plaintiffs' title. But this, properly considered, is a much stronger case; for it is not the case of a divestiture of title; for, as has been already shown, the title to the debt was already in the factor. To him only was the debtor legally responsible. It is only upon equitable grounds that he can entitle himself, as against the factor, who resists his right to claim this fund. And the great point in the cause is, *whether he has not, by his own act, estopped or concluded* himself from the equitable right, which he otherwise would have. had, to the proceeds of the goods. By the proceedings on the award, he elected to consider the factor as his debtor; for it is only on that ground that he could claim an award against him. The pretensions are inconsistent with each other; for it is on the allegation that Allen had ceased to be a debtor, by payment of the money to Roberts, that the arbitrator, at the instance of the principals, charged the factor with the debt. But what would be the practical effect of this doctrine? It would be this; to deprive the factor of a legal right, and to compel him to resort to the court of a foreign state, to relieve himself from the effect of the award. This, we think, would be unreasonable. For a Court of Chancery would not deprive a party of a legal advantage, except on principles of the purest equity. If a foreign factor, in anticipation of the receipt of a debt, for goods sold on account of his principal, sends him in payment a bill of exchange, signed by himself, which is not accepted, or if accepted, not paid, and suit is brought by the principal on the bill, and judgment rendered, can it be doubted that this is an election by the principal to consider the factor as his debtor, and that all his equitable remedy against the original debtor is relinquished? By the bill, the factor has rendered himself personally liable; and, by accepting the bill and pursuing it to judgment, the principal manifests his election, that he shall be his debtor, and thereby discharges all claim, which he otherwise might have had, against the person to whom the goods were sold. We, therefore, are of the opinion, that although Walker & Coggill may not have received actual satisfaction, yet they had legal satisfaction for this debt. From this it results that they have no right, either legal or equitable, to the fund now in the hands of the administrators of Merrick. As a corollary from this, it follows, that, after the award, the debt of Allen became the absolute property of Roberts.

It remains then to be considered, what effect the proceedings in

England have upon that right. The fund is claimed by the creditors of Roberts, under the commission of bankruptcy in England, and by the executors of Roberts here. It is clear from the facts given in evidence, that Coggill was a British subject, voluntarily residing in an enemy's country, carrying on commerce there; and that, as such, he was precluded from suing in the courts of Great Britain. *O'Mealley* v. *Wilson*, (1 *Camp.* 482). From this, in an ordinary case, it would follow, that the petition of Walker & Coggill, on which Roberts was declared a bankrupt, cannot be supported. *M'Conel* v. *Hector*, (3 *Bos. & Pul.* 113); *Roberts* v. *Hardy*, (3 *Maule & Selw.* 533); *Griswold* v. *Waddington*, (16 *John.* 438). By the war which took place in 1812, the partnership was dissolved, and no legal proceedings could be maintained during the war, by them, either by action, arbitration, or in bankruptcy. If this was a suit against a debtor of Roberts, there is no doubt the action could not be sustained for want of a good petitioning creditor. But was there not a good petitioner here? The objection is, that Coggill, standing in the situation of an alien enemy, could not maintain a suit; and that undoubtedly would have been a valid objection, if taken to the original action. But this was omitted; and can he, or any other person, now allege that one of the parties was an alien enemy, and had no right to maintain the suit? That matter has passed *in rem judicatam*, and is no longer the subject of inquiry. The award, as a judgment, is conclusive of the right, which cannot be disputed in any other action. That a judgment alters the situation of petitioners or bankrupt creditors, is shown by *Ex parte Charles*, (16 *Vez.* 256); *In the matter of John Charles*, (14 *East* 197). For, whatever doubt there may be as to whether a verdict for a tort will, yet, where there is a judgment on the verdict, it is such a debt as will support a commission. *Vide* 3 *T. R.* 539; 4 *T. R.* 570. Here, at the time the act of bankruptcy was committed, there had been a judgment, or an award, which is the same thing, for the debt of the petitioning creditors. This debt could not be impeached even directly, much less can it be impeached indirectly, by investigating the right of one of the creditors to sue in the courts of that state. How can Roberts, who was a party, and who omitted to take the objection at the proper time, be permitted now to call into question the right of Coggill to maintain the action? The objection was open to him then, and if he failed to take advantage of the defence, his mouth is ever after closed. All the assignees have to do, is to lay the judgment or award before the court; and this we must consider as conclusive evidence of such a debt as will support the commission. The petitioning creditor is bound to support the commission, and to furnish evidence of it; and what better evidence can be required of the debt, than the judgment of a court of competent jurisdiction? In 1815, Roberts brought suit against Hardy, Walker and *al.*, the commissioners under the bankruptcy,

[Merrick's Estate.]

in trespass for false imprisonment; and this, after a full hearing, was decided against him. It is a matter of no consequence why it was so ruled; it is sufficient that judgment passed against him, in a suit, the object of which was to try this question. It also appears that application has been made for a *supersedeas,* but without success. Under all the circumstances, the bankrupt would be restrained from disputing the validity of the commission. It perhaps may be unnecessary to decide whether, after such lapse of time, the chancellor would supersede the commission. It is sufficient that, though applied to, he has not thought proper to do . so; and, until it be done, there is nothing in the case to prevent the assignees from sustaining a suit to recover the debt—more especially, as here, where the debtor does not take the objection, but it comes from the bankrupt himself. A bankrupt, who has submitted for a considerable length of time to his petition, cannot petition to supersede it. *Flower* v. *Herbert,* (2 *Vez.* 326). No case has been cited where the bankrupt himself has been permitted, under the circumstances here presented, to interpose an objection to the recovery of the debt from his debtors, by his assignee, on the allegation of the want of a good *petitioner's* debt. A chancellor would, I conceive, enjoin him from intermeddling with such a suit. For, in the case of *Lowndes* v. *Cornford,* (18 *Vez.* 299), Lord Eldon observed that he would not suffer a bankrupt to try his commission by action against his debtors; and where a debtor was harassed between a bankrupt and his assignees, he granted an injunction, upon a bill of interpleader.

But it is said that the bankrupt of a foreign country is incapable of operating a legal transfer of property in the United States. And from it is inferred that the committee of a bankrupt in England cannot sustain a suit to recover a debt due the bankrupt in this country. But we think it definitively settled that a foreign assignee in bankruptcy may sue in the courts of Pennsylvania, in the name of the bankrupt, for the assets of the estate, and recover them, unless as against the rights of an American creditor. In England, the rule is well established that the property of a bankrupt passes to his assignees, wherever it may be situated, in the same manner as upon a voluntary assignment, modified by the law of the country in which the property may be situated. And this, we conceive, is shown by Judge King (2 *Ash.* 315) to be the law of this state. Bankruptcy in a foreign state does not operate as an absolute transfer of the bankrupt's estate in this country; but, subject to the rights of creditors, it gives the assignee an equitable interest in his effects. A legal title to the choses in action, does not pass to his assignee; but, subject to the rights of American creditors, an equitable one does. In *Abraham* v. *Plestoro,* (3 *Wend.* 535), since recognised in *Willink* v. *Renwick,* and *Johnson* v. *Hunt,* (23 *Wend.* 65, 87), the Court of Errors in New York, in opposition to the opinion of the Chancellor, has taken a different view of the

[Merrick's Estate.]

subject. But the rule settled in that state, we conceive to be in hostility to the principles of comity which ought to obtain among commercial nations. *Abraham* v. *Plestoro*, the leading case, has been considered by this court in *Lowry* v. *Hall*, (2 *Watts & Serg.* 32), and its authority much doubted. Indeed, this doctrine cannot well stand with *Mulliken* v. *Aughinbaugh*, (1 *Penn. Rep.* 117), and with the case of *Lowry* v. *Hall*, above cited. The rule in Pennsylvania is, that an involuntary transfer, by process in a foreign state, will be disregarded only so far as to protect the claims of our own citizens. The extent of the qualification has not, so far as I am aware, been decided; that is, whether the claims of creditors of the bankrupt at the time of the suit will be protected, or whether it is confined to creditors of the bankrupt at the time of the assignment. On this point we give no opinion.

From these premises it follows that the assignee of Roberts, viz., William Walker, was entitled to the money. But he is dead; and although he became bankrupt, yet, as trust estates do not pass by the assignment, but only such property as the bankrupt had an equitable, as well as a legal title in, and which is applicable to the payment of his debts, his assignees have no claim. *Scott* v. *Surman*, (*Willes* 402); *Winch* v. *Keeley*, (1 *T. R.* 619); *Carpenter* v. *Marnell*, (3 *B. & P.* 40); *Gladstone* v. *Hadwen*, (1 *Maule & Selw.* 526). Nor can it be pretended that it goes to his personal representatives.

Since the death of William Walker, who was the sole assignee of Roberts, we have no evidence that any assignee has been appointed in his stead. There is, therefore, no person now appearing in this court, who has any title, legal or equitable, *to* receive this money from the administrators of Merrick.

This view of the case makes it obviously unnecessary to decide whether the Orphans' Court have power to *compel the payment* of this fund. No objection seems to be interposed by the administrators; and, unless there are creditors of Roberts, which does not appear, there is no person besides who has any interest in the question. When the proper party appears, they may elect whether they will proceed in this manner, or by an action at common law. Until then, we decline giving an opinion on the question of jurisdiction. On the whole case, we are of opinion that the decree of the Orphans' Court, ordering the money to be paid to the assignees of William Walker, be reversed. It *is* further ordered that the cause stand over for further hearing, when proper parties shall appear.