W. H. Hyde, J. K. P. Hall, Andrew Kaul, and W. H. Hyde, Executor of Joseph S. Hyde, trading as the Portland Lumber Company, *v.* Jesse Kiehl, Sheriff, Appellant.

*Contract—Waiver—Evidence—Acts and declarations.*

While waiver of the terms of a contract may be shown by acts and declarations of the parties, the burden of proof is upon the person alleging the waiver to satisfy the jury that the acts and declarations relied on are such as would warrant the jury in finding that there was a waiver of the original terms of the contract.

*Sheriff's sale—Distribution—Inconsistent positions.*

At the distribution of a fund raised by a sheriff's sale, no question can be raised concerning the regularity of the proceedings by which the fund was brought into court, and therefore no party claiming under title adverse to the proceedings can share in the distribution.

*Trespass against sheriff for wrongfully selling goods—Claim of property at sale by owner—Suit prosecuted to judgment—Estoppel.*

An action for trespass prosecuted to judgment against the sheriff or the plaintiff in the execution by the owner of the goods is a bar to assumpsit for the money received from the sale, and vice versa, but nothing less than the prosecution of the suit to judgment can have such effect.

Where a person whose goods are wrongfully sold by the sheriff, gives notice at the sheriff's sale that the goods belong to him, and that the purchaser will take no title, he is not estopped by said notice from maintaining an action of trespass against the sheriff.

*Sheriff's sale—Wrongful sale—Measure of damages.*

In an action against a sheriff for an alleged wrongful sale of plaintiffs' property, if it appears that the plaintiffs bought in the property at the sale, the measure of their damages is not the full value of the property but the expense and loss they were put to in getting it back, including any loss by its seizure and detention, and the price which they paid to the sheriff; but where the property is bought in for plaintiffs by their agent, they cannot waive their rights and ratify the agent's act for his own benefit, to the prejudice of the defendant's rights, by claiming the full value of the property.

Argued Oct. 2, 1897. Appeal, No. 57, Oct. T., 1897, by defendant, from judgment of C. P. Clarion Co., on verdict for plaintiffs. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Trespass for an alleged wrongful sale of plaintiffs' property.

Before RAYBURN, P. J., of the 33d judicial district, specially presiding.

The facts appear by the opinion of the Supreme Court, and by the charge of the court below, which was in part as follows :

The plaintiff in this case is the Portland Lumber Company and the defendant is Jesse Kiehl. The subject in controversy between the parties is five rafts of timber—one of small timber and four of large. These five rafts of timber were sold by Jesse Kiehl, the sheriff of Clarion county, on one or more writs that were placed in his hands, in which W. W. O'Neil, Jr., was the defendant, and by virtue of those writs Jesse Kiehl levied on those five rafts as the property of O'Neil. After the writ had come into the hands of the sheriff (it is in evidence) Mr. Maffett, the attorney for the Portland Lumber Company, verbally notified him that the property was not that of O'Neil but

was the property of the Portland Lumber Company; and on the day of the sale Mr. Maffett, as attorney for the Portland Lumber Company, as each raft was offered for sale, went on the raft and gave notice (which has been offered in evidence) to the bidders that the purchasers of these several rafts would not take title to the property, and in the notice, stating that it was not the property of W. W. O'Neil, but was the property of the Portland Lumber Company. These rafts were sold by the sheriff, and now the plaintiffs bring this action against the sheriff to recover for the price or value of the rafts at the date of the levy, namely, the 20th day of April, 1893. You will remember the testimony of Mr. Maffett and the sheriff as to the giving of notice, and the sheriff's stating that he would not sell unless a bond was given; and the evidence shows there was a bond given to indemnify the sheriff, and he went on and sold the property. Now, the plaintiff company has shown in evidence that the property did belong to it, and that J. K. Gardner as its agent entered into an agreement with W. W. O'Neil to sell him certain rafts. You will remember the testimony of Mr. Gardner that he met Mr. O'Neil in Pittsburg and, in a conversation there, O'Neil stated he would be in the market for timber, and Gardner replied that he would be in the market with timber, and perhaps they could deal—something to that effect, and that afterwards O'Neil came to Hallton, after notifying Mr. Gardner to be there. They went up and looked at this timber. It was then piled on the beach, four or five logs high, upon skids, and at that time he named to O'Neil the price, namely, twelve cents for small timber and fifteen cents for large. That at that time O'Neil stated that he was expecting to get another contract and might need more lumber, and he would take this proposition of Mr. Gardner's into consideration, or under advisement, and would write him. That afterwards he wrote a letter to J. K. Gardner, dated March 8 (which is in evidence before you), in regard to this pine timber that was for sale there, and also saying he had a contract for building a coal tipple; and in that letter he agreed to take certain timber from Mr. Gardner at the price quoted of fifteen cents for the large, or gunnel timber, and twelve cents for the smaller, adding: "I take it for granted that they (the terms) are to be one third cash, one third ninety days, balance four months." In response to that letter, Mr. Gardner

writes Mr. O'Neil: "We accept your terms on pine timber and will commence delivering it to you as soon as the weather gets warm enough to run. As to the measure, if I can get a good competent person to measure it here, I will do so, and if I do not succeed in finding such a person, then we will get some one at your place. I understand you want all timber landed above State Road Riffle, on the right side, near the old Ritts mill."

Now those two letters constituted at that time the contract between these two parties as to this timber in dispute, and we say to you that if there was not any evidence offered to indicate or show that there was any waiver of the terms of this contract, then the title to the property never passed to W. W. O'Neil, and the sheriff would not have any authority to levy upon it and sell it, and the plaintiffs could recover in this case, because when property is sold by one man to another if anything remains to be done, either by the seller or the buyer as to it, as to ascertaining the weight, amount, or measurement, or putting it into condition for delivery, by which the buyer could accept it, the title to the property does not pass. Now the theory of the defendant in this case is that the terms of this contract were changed subsequent to this time. In support of that theory witnesses were called who testified as to what transpired between the parties subsequent to this time in reference to the timber. You will remember that at first there were two rafts run down, which were taken into possession by W. W. O'Neil, or his employees, and sawed up—at least one and a part of another; some of the witnesses stated that both were sawed up, and others that one and part of another were sawed; that James K. Gardner came to the mill after that was done, came there with J. D. O'Neil, a brother of W. W. O'Neil, and that he went upon the mill, and there was some inquiry made as to the measurement—whether those rafts had been measured. I believe one of the witnesses testified that the rafts had been measured, that a man by the name of Spence, or Meddock (I forget which it was), had measured them. Then afterwards, on April 5th James K. Gardner and W. W. O'Neil met here, in Clarion. O'Neil testifies that he came here and met Gardner at the train; that they came up street to the Jones House; that he said to Mr. Gardner he knew what he wanted with him, that is, seeing in reference to his, O'Neil's, financial responsibility; that they

came to the Jones House and he showed Gardner a note he had of one Krepps & Son, and that after talking there awhile they went over to the bank. In the first place O'Neil stated that he was going to pay this thousand dollar note upon the timber contract and that there was some dispute in reference to the discount or in reference to a receipt that was to be written, and that they went over to the bank, to Mr. Arnold, and he settled the question of discount for them, how much it would be, and that there, in the bank, he (O'Neil) indorsed this note over to Mr. Gardner on the timber contract; that there was a conversation there and O'Neil said to Arnold in that talk that the dealings between them, or the contract, amounted to between seven and eight thousand dollars, and he also stated he believed Gardner told Arnold the same thing—at least he gave Arnold some figures. Mr. Arnold testifies that the note was indorsed in the bank, on the table in the back room of the bank, and that there was some conversation in reference to the amount of dealings between the parties; the amount was seven or eight thousand dollars, and there was a conversation there, also, in reference to the financial ability of O'Neil. Now in reference to that transaction, Mr. Gardner testifies that he met O'Neil at the train that morning and they came to the Jones House; that there they had a conversation, and, that the thousand dollar note of Krepps & Son was indorsed over to him, but it was on the siding contract; that that was understood at the time, and was so spoken, and that there was a statement there of Hall, Gardner & Company with W. W. O'Neil in reference to it; and there was a receipt written on the back of that statement or bill and given to W. W. O'Neil. Mr. O'Neil states there was a statement written at that time, but it was not signed; that they went over to the bank, for something in reference to the receipt, and that while over there, in their conversation, he supposed it was forgotten; that he had it in his possession for some time afterwards, and states that it was not of any value, not being signed, and it, together with other papers, he believes was destroyed by his wife at his direction. In reference to this note transaction between these two parties, J. D. O'Neil is called and he testifies that along about April 18, 1893, he met Mr. Gardner in Pittsburg at the Boyer House; that there Gardner showed him this note and asked him whether it was good

or not, and his reply was that it was good, and that Gardner there said it was a payment upon the timber contract. In support of Gardner's statement in reference to the transfer of this note, and as to the account it was to be credited on, you will recollect the testimony of Mr. Bartlett, who states that he saw Gardner in Pittsburg about April 7th or 8th, and had a conversation with him; that Gardner told him he had gotten the Krepps's note from O'Neil and that it was upon the siding contract. Mr. Knopsnyder, also, was called and testified that in a conversation with Gardner shortly after April 5th, Gardner stated to him that it was a credit on the siding contract; that that note had been transferred from O'Neil to him. Mr. Hyde also testifies to the same fact, and that the note was delivered to him as the firm of Hall, Gardner & Company.

Now, in order to understand that testimony, we state to you that the ordinary rule of evidence is that the declarations of a party cannot be received in evidence in support of his claim. But there is an exception to that rule, and we have admitted this testimony; and that testimony is to show that the testimony of Mr. Gardner upon the witness stand here was not of recent date; that he made those statements to these parties just shortly after the transaction had happened, and before there was any prospect of a controversy, and that there was no motive in his telling other than what the transaction really was. But if you do not believe Mr. Gardner's testimony that that transpired at the time he says it did, in the Jones House, and in the manner he says it did, then the evidence of those witnesses is of no avail; but you will take that into consideration in determining this matter. In support of the evidence of Mr. Gardner as to what transpired at the time of the transfer of this note, Edward S. Shippen was called by the plaintiffs. He testified that he met W. W. O'Neil on a Sunday morning, April 9, 1893, and that O'Neil there said to him that he had paid to Mr. Gardner the thousand dollar note, the Krepps's note, on the siding contract, last week, in Clarion. Mr. Knopsnyder also stated that a few days after April 5, he was on the train with Mr. Gardner and W. W. O'Neil, and that he had a conversation with O'Neil in which O'Neil stated he had settled with Gardner for all he had bought; that they were talking about the siding contract and he said he had settled for the siding contract a day or two

before that, at Clarion. Mr. Knopsnyder says that this was
between the 5th and the 7th of April, 1893; and it is not dis-
puted but what this transaction took place between these par-
ties on April 5, 1893, at the Jones House or at the bank. In
this connection you will also remember the testimony of W. W.
O'Neil, who states that he did not have any such conversation
either with Knopsnyder or with Shippen. Also in that connec-
tion you will recollect the testimony of Mr. Shippen as to the
conversation between him and W. W. O'Neil at the Boyer
House; that he said in that same conversation that Gardner
had run a raft in, and it had been cut and it was not up to what
the agreement was; that the timber was not the timber he had
bought, and that he was not going to take the balance of the
timber, and he would not settle for what he had got without
deduction. Now you take that into consideration in determin-
ing which of these parties is telling the truth in reference to
the transfer of this note at the Jones House. If Mr. W. W.
O'Neil made that statement to Mr. Shippen at that time, then
you would take that into consideration in connection with his
testimony as to what transpired at the Jones House—whether
he had paid the thousand dollar note on the timber contract or
not. This evidence, gentlemen, you will consider carefully,
because there seem to be certain contradictions in reference
to it.

On the part of the defense two telegrams have been offered,
which were sent on April 5, 1893, by J. K. Gardner; one to
W. M. Gardner, who was the jobber for the Portland Lumber
Company, and was cutting, manufacturing, rafting and running
this timber for that company; and also one to W. H. Hyde,
who was a member of the Portland Lumber Company. The
one to Mr. Hyde reads thus: "Have all pine rafts back and
one hemlock raft delivered to State Road. J. K. Gardner."
The one to W. M. Gardner reads: "Deliver all pine now back
and one hemlock raft to State Road. J. K. Gardner." Both
telegrams are dated on April 5. You will remember the testi-
mony of O'Neil and Gardner as to what was done on that day
here in Clarion; that they went to the telegraph office at that
time and these telegrams were sent. There was some testimony
then in reference to some lines. It is not disputed, I believe,
by either Mr. Gardner or Mr. O'Neil that at that time Mr. Gard-

ner requested that Mr. O'Neil or his men would have a river line there to help them land that it was a bad place to land. Mr. O'Neil testified, also, that Gardner requested him to put his lines on, as the jobbers did not want to leave their lines on the river, they were always anxious about that, to take their lines with them, and O'Neil states that he promised he would do so. After April 5, the other rafts in controversy were sent down by W. M. Gardner into the eddy, I believe it was, above the ripple at Duck Rock; they were landed there and the lines taken off, that is the jobber's lines were taken off, and the lines of O'Neil were put on those rafts—W. M. Gardner and his men came there and took them off and requested O'Neil's men to put the other lines on, and those rafts were dropped down, I believe, by T. J. Brenneman and one or two others.

You will take these facts and circumstances into consideration in determining whether or not there was a waiver of the terms of the original contract; that is, that it was delivered; that is, that it was the intention of J. K. Gardner, as the agent of the plaintiff company, to deliver this timber without requiring O'Neil to perform the covenants in the contract as to paying the one third cash. You will recollect that the timber was to be measured either up above or after it came down there by a man selected to do so; and this contract would indicate that that man was to be selected by Gardner or by the plaintiff company either at the place where it was rafted in or down at the place where it was landed. There the contract might indicate that the man was to be selected either by the plaintiff company or by the company together with O'Neil. You will recollect there is not any evidence here that there was any agreement between the parties as to the selection of a man to measure the timber except the testimony of W. W. O'Neil, who states that he thinks Gardner agreed for Mr. Meddock to measure the timber; and there is some evidence that Meddock did measure a portion of the timber, but he testifies that the plaintiff company had no notice from him that he was to measure it; but he sent the measurement, I believe, to J. K. Gardner, and it went into the possession or hands of Mr. Hyde, a member of the plaintiff company, some time along about the 28th day of April, which was after the levy. The letter is dated April 18, and Mr. Meddock said he believed he sent it the day it was written.

Now, gentleman, you have in evidence the two letters which constitute the original contract between these parties, and we say to you that if there was nothing more than that we would have to instruct you to find for the plaintiffs. But you must go further than that; you must take into consideration the evidence that has been given before you and which we have rehearsed to you, as to whether or not the terms of this contract were waived in any manner, and the timber was delivered into the possession of W. W. O'Neil or his men without requiring the terms of the contract to be complied with. If you find from the evidence that the contract was not changed or waived in any way by J. K. Gardner or the plaintiff company, then it would be your duty to find a verdict for the plaintiffs for the five rafts in dispute, or, rather, for the value of them at such price as the evidence given before you would warrant. But [if you find that the contract was changed, that there was a delivery into the hands of W. W. O'Neil or his men of this timber, without the plaintiffs or agent insisting upon the performance of the terms of this written contract, that, we say, in law would constitute a delivery, and title would pass to the defendant and it would be your duty then to find a verdict for the defendant. But there being this written contract between the parties, and it upon its face must be construed that the title to the property did not pass by this contract at the time it was made, now you must find from the evidence that it was the intention of J. K. Gardner, the agent of the plaintiff company, or of the plaintiff company, to let the title pass into the hands of W. W. O'Neil without requiring him to perform his part of this contract; that is, to have the money paid and to have the timber measured. It is in evidence that this timber was not measured, except what was testified to by Mr. Spence and Mr. Meddock, until after the date of the levy, when Mr. Webster measured it. Now you must infer from the actions of the parties subsequent to this act that it was the intention of the plaintiff company to let the title pass into the hands of W. W. O'Neil without being paid the one third in cash, and without the company having measured it; and to arrive at that intent you take the testimony of these witnesses into consideration.] [2]

Now, whether there was anything paid or not. This thousand dollar note, even if that was paid upon the timber contract,

that, in accordance with the amount of the contract and the amount of the timber, at the rate agreed upon, would not constitute the one third of the cash price agreed on. You will also take these telegrams into consideration, as to what was said in them; whether or not J. K. Gardner intended by them that the timber should be delivered to W. W. O'Neil without requiring him to pay the one third cash, and whether or not he intended it to go into O'Neil's possession without Gardner first having a man to measure it. If you find that the title to this property passed to W. W. O'Neil—and before you can find that the title did pass to him you must find that it was the intent of the plaintiff company, by its acts after this contract was made, to change that contract, to let O'Neil have the timber without its being measured and without his paying the one third cash—if you find that was the intent, then that is an end of your duties in this case, the plaintiffs could not recover. But if you find it was not the intent of the parties to change this first original contract, then you go further and find what the price of this timber is. The rafts were measured by a man by the name of Webster, and he testified that the small raft, the first one, contained 4,899 cubic feet, that the second one had 4,370, the third, 6,006, the fourth, 5,592, and the fifth 8,030 cubic feet; that out of one of those rafts there were thirty-six sticks to be deducted. You will recollect the testimony of the witnesses as to what the timber was worth per cubic foot. There were several witnesses called on the part of the plaintiffs who testified as to what the timber was worth. Webster, I believe, testified that at the Pittsburg market the large timber was worth eighteen cents and the smaller about fourteen; Bartlett testified that the large timber was worth seventeen to nineteen cents and the small from twelve to thirteen cents; James Howe that the large timber was worth sixteen or seventeen cents per cubic foot and the small twelve and a half cents; A. W. Wallace testified the large was worth seventeen to eighteen cents per cubic foot and the small twelve to thirteen cents. They do not vary much in their testimony as to the market value. You also have the testimony of one or two persons that the expense of running would be from one and a half to two cents per cubic foot.

As to the value of the timber the defendant called Mr. Ritts, who is a lumberman, and he testified in regard to the value of

timber along from about the 1st to the 14th, that it was then, for large timber, I believe, about sixteen to eighteen cents, but after that time there was a drop in the market of about one to three cents. He does not state definitely when that happened, whether it was gradual or happened in a day or two. So you will take his testimony into consideration, whether or not the market value of this timber at Pittsburg was on April 20, the day of the levy, as much as the witnesses on the part of the plaintiffs have testified. Mr. Bartlett also stated there was a break in the market some time that spring; he left Pittsburg on April 14, and could not tell just exactly when it happened. You will recollect, also, the testimony of the witnesses as to the deductions in some of this timber at the time Mr. Gardner sold it afterwards, he having purchased part of it at sheriff's sale. And then you will also take into consideration the testimony of James Taylor and Mr. Flesher, who bought this timber from Gardner, and what they say in reference to the condition and quality of it, in arriving at whether or not the witnesses have testified as to the correct value of it.

We have been requested to answer the following points on the part of the plaintiffs :

1. There is not sufficient evidence of waiver of the terms of measurement and payment as to the five rafts in controversy in this suit, even if the jury should find from the evidence that there was such a waiver as to the two rafts of small pine that had been sawed up before the levy, and the verdict of the jury should be for the plaintiffs. *Answer :* That point is refused. But we say to you unless you can find sufficient evidence subsequent to the delivery of those first two rafts to change the terms of the original contract, the delivery of those two rafts being prior to the date of April 5, would not of itself change the contract. You cannot take into consideration by itself the delivery of the two rafts to the mill as a change of the terms of the contract. Then, if they were delivered, the contract being an entire contract, the fact that two of the rafts were delivered and put into the possession of W. W. O'Neil prior to April 5, would not change the title to the subsequent rafts that were run down and are claimed for in this suit. [1]

7. That under the contract and the undisputed facts in evidence the title to the five rafts in controversy in this case re-

mained in the plaintiffs at the time of the levy thereon by the defendant unless there was a waiver of the terms of measurement and payment by the plaintiffs or their authorized agent. *Answer :* That point is affirmed. Unless you can find from the evidence in this case that there was a waiver of the terms of the contract, that is, of measurement and payment, by the plaintiffs or their authorized agent, the title to the five rafts remained in the plaintiff company. [3]

The defendant requests us to answer the following points :

1. The plaintiffs by their duly authorized agent and attorney having orally notified the sheriff after the levy that they claimed title to the pine timber levied upon, and that they would give him a written notice before the sale, and having in pursuance of such oral notice, at and immediately before the sale given the written notice in evidence that " the purchaser under this sale will take no title to the property sold," are estopped from recovering from the sheriff any other or greater damages than such as had accrued from the detention of the property during the time it was in his constructive possession under the levy. *Answer :* That point is refused. [4]

Gentlemen, you will take this case ; weigh the evidence carefully ; and we say to you that [if you find from the evidence that the title did not pass to W. W. O'Neil, Jr., it would be your duty then to return a verdict for the plaintiffs for the value of those five rafts.] [5] If you find that title had passed to W. W. O'Neil, Jr., then your verdict must be for the defendant.

Verdict and judgment for plaintiffs for $4,916,10. Defendant appealed.

*Errors assigned* were (1–5) above instructions, quoting them.

*C. Heydrick* and *W. A. Hindman,* with them *Harry R. Wilson, C. Z. Gordon* and *W. H. Hockman,* for appellant.—Conceding that no one of the undisputed facts is, by itself, sufficient evidence of a transfer of the possession, or delivery, under the contract, we contend that all taken together constitute such delivery as transferred the title : Leedom v. Philips, 1 Yeates, 527 ; Harris v. Smith, 3 S. & R. 20 ; Bowen v. Burk, 13 Pa. 146 ; Smith v. Smith, Murphy & Co., 21 Pa. 367 ; Mackaness v. Long, 85 Pa. 158.

The notice given at and immediately before the sale of each raft was an election of remedies which should estop the plaintiffs from recovering more in this action than the damages which they may have sustained by reason of the detention of the property, while it was under levy: Floyd v. Browne, 1 Rawle, 121; Vetter's App., 99 Pa. 52; Edwards' App., 105 Pa. 103; Birney's App., 114 Pa. 519; Butler v. Hildreth, 5 Metc. 49; Moller v. Tuska, 87 N. Y. 166; Fire Ass'n v. Rosenthal, 108 Pa. 474; Stutz v. Coal & Coke Co., 131 Pa. 267; Wise v. Rhodes, 84 Pa. 402; Nield v. Burton, 49 Mich. 53.

*B. J. Reid*, with him *F. J. Maffett, Geo. F. Whitmer* and *Geo. A. Jenks*, for appellees.—It is improper to assign as error isolated sentences wrenched from their position and connection in the general charge, which when read in their proper connection are free from error: Com. v. Zappe, 153 Pa. 498; Irvin v. Kutruff, 152 Pa. 609.

Where the buyer is by the contract bound to do anything as a consideration, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer: 1 Benj. on Sales (Corbin's ed.), secs. 366, 417; Elgee Cotton Cases, 89 U. S. 187; Lester v. McDowell, 18 Pa. 91; Henderson v. Lauck, 21 Pa. 359; Com. v. Hess, 148 Pa. 99; Pike v. Vaughn, 39 Wis. 499; Gibson v. Tobey, 46 N. Y. 641; Miller v. Munhall, 34 Leg. Int. 321.

When the five rafts in question were delivered at "State Road," there remained two more to be delivered, and the time for measurement and payment had not yet come: Shinn v. Bodine, 60 Pa. 182; R. & O. Oil Co. v. Hughey, 56 Pa. 322; Leedom v. Philips, 1 Yeates, 527.

The bringing of a suit against the sheriff will not of itself vest a title in the purchaser; nor will a verdict therein; nothing short of a judgment on the verdict will change the title and bar the owner's remedy against the purchaser: Floyd v. Browne, 1 Rawle, 121; Marsh v. Pier, 4 Rawle, 273; Fox v. Northern Liberties, 3 W. & S. 103.

To estop a party it must appear (1) that he has made an admission which is clearly inconsistent with the evidence he

proposes to give; (2) that the other party has acted on the admission; (3) that the latter will be injured by allowing the truth of the admission to be disproved. All these elements are essential: Eldred v. Hazlett, 33 Pa. 316; Birney's App., 114 Pa. 520.

OPINION BY Mr. JUSTICE MITCHELL, January 3, 1898:

There is not much room for controversy over the law of delivery, or of waiver, as involved in this case, but appellant claims that the charge of the learned judge below so applied the law to the facts that the jury were misled. An examination of the charge as a connected whole fails to sustain the complaint. The expressions assigned for error, and perhaps some others, taken separately and apart from their context might seem to fail in giving due weight to the acts of the parties in regard to the first two rafts, as showing that they, or at least the plaintiffs, did not mean to insist on the strict terms of the contract, and might also have a tendency to lead the jury to suppose that the defense required proof of an express alteration of the contract, and not merely an indulgent or loose enforcement of it, from which a waiver might be implied. But taken in its entirety the charge gave the law correctly to the jury and at least once in the very words asked by the appellant himself and in connection with the facts relied upon by him as a defense. His second point was that " if the plaintiffs in pursuance of the contract in evidence sent two rafts of timber to the place designated for delivery, and W. W. O'Neil, Jr. accepted the same, took possession thereof, caused the same to be measured, and commenced manufacturing the same upon his mill; and while he was so manufacturing the same James K. Gardner, by whom and in whose name the contract was made, visited the mill and there learned what had been and was being done with the timber, and made no objection thereto, but afterwards, with full knowledge of the facts, met the said O'Neil in Clarion and, after receiving part payment on account of the timber specified in the contract, ordered the remainder of the said timber to be delivered at the place designated for delivery, and then and there requested the said O'Neil to have his lines ready to secure the rafts when they should arrive, and the said timber was in pursuance of said Gardner's orders sent to the said place of delivery, and the per-

sons in whose charge it was so sent notified said O'Neil's employees thereof and took their lines from the rafts and left them without any other provision for their care than such notification ; and the said O'Neil's employees thereupon took charge of the said rafts and secured them with his lines ; and the plaintiffs thereafter exercised no care over the same to prevent their loss by floods or other casualties, the jury may find that the plaintiffs waived the provisions of the contract in respect to measurement and full payment of the hand money, as conditions precedent to delivery and vesting of title, and that the delivery was complete and title vested in O'Neil before the levy." This was affirmed without qualification. Again when the jury came in and requested further instructions on the subject of waiver the judge, after repeating in substance what he had said before, continued : " We will say in addition to that, you do not require the express proof of a waiver ; you can infer a waiver from the acts and conduct and declarations of the parties ; but the burden of proof is upon the defendant to satisfy you that those acts and declarations were such as would warrant you in saying that there was a waiver of the original terms of the contract." If there was any danger that the jury might have been misled by some detached expressions in the previous portions of the charge, it was removed by these clear directions, and the charge as a whole is not open to the criticisms based on the first three assignments of error.

The next and perhaps most serious question is the effect of the notice given by the plaintiffs at the sheriff's sale. Appellant claims that as it tended to deter bidders and thereby prevent the property from bringing its full value, it should be treated as a binding election to pursue the remedy against the purchasers and operate as an estoppel against plaintiffs' present demand. This argument is not without apparent equity. It derives some support also from the cases cited by appellant: Vetter's Appeal, 99 Pa. 52, Edwards' Appeal, 105 Pa. 103, and Birney's Appeal, 114 Pa. 519. But these were all cases of distribution of a fund in court as proceeds of a sheriff's sale, and really rest on the principle settled in Bush, Bunn & Co.'s Appeal, 65 Pa. 365, that no question can be raised concerning the regularity of the proceedings by which the fund was brought into court, and therefore no party claiming under title adverse

to the proceedings can share in the distribution.  " Thus, if the goods of A are sold upon an execution against B, A cannot be heard to urge his right to the proceeds, however clear and indisputable may be his title to the goods."  And the reason is that the fund represents the title of the defendant in the execution, whether it be good or bad; those who affirm its validity and claim under it are entitled to share in the fund which it produced, but those who dispute it and claim adversely to it must stand on their adverse title and pursue their remedy upon it, either against the sheriff for the trespass or against the purchaser for the property itself.   Otherwise they would be claiming and recovering upon adverse and inconsistent rights.

Upon this same ground, that no party can be allowed to recover on repugnant rights, it is held that an action for trespass prosecuted to judgment against the sheriff or the plaintiff in the execution is a bar to assumpsit for the money received from the sale, and vice versa.   One is in disaffirmance of the sale and the other in affirmance or ratification of it, and they cannot stand together.   In Floyd v. Browne, 1 R. 121, it was held that the judgment against the plaintiff in the execution was a bar to a subsequent assumpsit against the sheriff, although the judgment had been fruitless as to execution.   This case is much relied on by the appellant, as less strong than the present, and it is argued that the distinction between the institution of a fruitless suit and the giving of a notice, such as was given here, is shadowy in so far as a manifestation of an election is concerned.   But the basis of decision in Floyd v. Browne is that by the judgment against the trespasser the title to the goods was divested out of the former owner, the plaintiff, and he could not subsequently maintain any action founded on that title.   It was a debatable question in Floyd v. Browne whether the title was fully divested by a judgment without satisfaction, and in Fox v. Northern Liberties, 3 W. & S. 103, it was said that the authorities on the subject are conflicting.   But in Merrick's Estate, 5 W. & S. 9, it was said that it was no longer an open question in this state: " A judgment for the value of a chattel is placed on the same footing as an actual satisfaction, and consequently divests the plaintiff's title."

But while it is thus held that a judgment is per se a bar, no case has been found which holds that anything less than a judg-

ment shall have that effect. The technical reason of divesting the title does not apply to a notice such as was given in the present case, and we should be taking a long and doubtful step in advance of our previous decisions by holding that such notice should operate as an estoppel. It is said by SHARSWOOD, J., in Bush, Bunn & Co.'s Appeal, 65 Pa. 363, already cited, that "it is every day's practice for such an assignee or vendee under a bill of sale " (i. e. the claimant of an adverse and superior title) " to give notice to the sheriff and at the sale, and pursue his remedy either by an action of trespass against the sheriff, or of trover or replevin against his vendee." While the effect of such notice is to deter bidders, and thus lead to an apparent hardship on the sheriff in preventing his receiving the full value of the goods, and yet holding him subsequently liable to the same party for such value, yet there is a countervailing equity in the claimant. In the eye of the law he is being wronged by the sale of his goods as the property of another. The law gives him a choice of remedies, either to maintain his title against the goods themselves in the hands of the purchaser or to let the goods go and hold the sheriff for the trespass. One or other of these remedies may be preferable according to the circumstances. If there be a single purchaser at a very inadequate price the owner may elect to pursue the goods, while if the purchasers are numerous and prices vary, so as to involve many suits and perhaps difficulty of proof of values, he may decide to abandon the goods and seek damages for the trespass. Why should he be compelled to make his election before he can have full knowledge of the facts? No rule of law yet declared has required him to do so, and we do not think the equity against him is clear enough to justify us in giving a new and perhaps dangerous effect to what has been characterized by this court as " every day's practice."

Of course, a notice not given bona fide in furtherance of a genuine claim would stand on a different basis. This was one of the grounds of decision in Birney's Appeal, 114 Pa. 519, already cited, where it was said by the present Chief Justice, " in the absence of any explanation it is not unreasonable to infer that his purpose was to secure the property at an undervalue and then, to the detriment of the defendant in the execution as well as his creditors, claim the greater part of the

proceeds of the sale as applicable to his own lien.    To sanction such a transaction would be to encourage the practice of deception, trickery and fraud." There is no such element in the present case.    We hold therefore that the plaintiffs were not estopped from this action by the notice given at the sheriff's sale that the goods belonged to them and the purchaser would take no title.

But although the appellant's contention as to the measure of damages was broader than we can sustain, yet the facts show that the jury were given too large a standard for their verdict. If the plaintiffs had bought in the lumber, and thus been restored to the possession of their property, their damages would have been, not its full value, but the expense and loss they had been put to in getting it back, including any loss by its seizure and detention, the price they had paid the sheriff, etc.    But the uncontroverted testimony shows that plaintiff's agent bought in four of the five rafts sold, under such circumstances as made him a purchaser for them.    Gardner, the agent, was in charge of the proceedings for his employers.    One of the plaintiffs, Mr. Hyde, testified that Gardner was authorized to employ counsel to look after plaintiff's interests, including the giving of notice at the sale.    Gardner himself testified that he reported his purchase to his employers and they made no objection : " It was perfectly satisfactory with the Portland Lumber Company, as they had adopted their plan of defense.    Q. They had adopted their form of procedure?   A. Yes." It is entirely clear therefore that in law the purchase by Gardner was a purchase by plaintiffs.    As between him and themselves plaintiffs might have waived their rights and ratified his act for his benefit. But they could not do so to the prejudice of defendant.    Having been restored to the legal possession of their property, the measure of their damages was fixed by the loss and expense they had been put to up to that time, and they could not enlarge the defendant's liability by any subsequent act of their own.    The jury should have been so instructed.    We must therefore sustain the fifth assignment of error.

Judgment reversed and venire de novo awarded.